THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed:
April 10, 2018

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

Trademark Trial and Appeal Board

_____

*In re FCA US LLC*

_____

Serial No. 85650654

_____

William M. Bryner and Judith A. Powell of Kilpatrick Townsend & Stockton LLP
   for FCA US LLC.

Saima Makhdoom, Trademark Examining Attorney, Law Office 101
   (Ronald R. Sussman, Managing Attorney).

_____

Before Adlin, Gorowitz, and Masiello, Administrative Trademark Judges.

Opinion by Masiello, Administrative Trademark Judge:

FCA US LLC ("Applicant") filed an application[1] for registration on the

Principal Register of the mark MOAB in standard characters for "Motor vehicles,

namely, passenger automobiles, their structural parts, trim and badges," in

International Class 12. The Trademark Examining Attorney refused registration

under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), on the ground that

_____

[1] Application Serial No. 85650654 was filed on June 13, 2012 on the basis of Applicant's
assertion of its *bona fide* intention to use the mark in commerce under Trademark Act
Section 1(b), 15 U.S.C. § 1051(b).

Applicant's mark so resembles the registered mark MOAB INDUSTRIES in standard characters as to be likely to cause confusion or mistake, or to deceive, when used in connection with Applicant's goods. The cited mark is registered in the name of Moab Industries, LLC ("Registrant") for "Automotive conversion services, namely, installing specialty automotive equipment," in International Class 37.[2]

During examination, Applicant (known at that time as Chrysler Group LLC)[3] petitioned for cancellation of the cited Registration (Cancellation No. 92057939); and Registrant brought suit against Applicant in the United States District Court for the District of Arizona. *Moab Industries LLC v. Chrysler Group LLC*, No. CV-12-08247-PCT-HRH ("*MIL v. Chrysler*"). The Examining Attorney suspended action on the application. The District Court issued its final decision on October 6, 2016 (the "Decision"), dismissing Registrant's claims.[4] Registrant appealed the District Court's judgment to the Court of Appeals for the Ninth Circuit; that appeal was dismissed by stipulation of the parties on December 9, 2016.[5] Cancellation No. 92057939 was dismissed without prejudice by stipulation of the parties on December 15, 2016. Thereafter, the Examining Attorney resumed examination of the application and

---

[2] Reg. No. 3912705 (the "Registration") issued February 1, 2011. Section 8 affidavit accepted; Section 15 affidavit acknowledged. Registrant has disclaimed the exclusive right to use INDUSTRIES apart from the mark as shown.

[3] Applicant recorded its change of name from Chrysler Group LLC to FCA US LLC on December 16, 2014 at Reel 5420, Frame 0439 of the title records maintained by the USPTO's Assignments Branch.

[4] *See* Applicant's response of December 23, 2016 at 266-90.

[5] *See id*. at 292.

issued a final refusal of registration under Section 2(d). Applicant appealed to this Board. The case is fully briefed.

1. <u>The District Court case</u>.

In *MIL v. Chrysler*, Registrant asserted four claims: federal trademark infringement; federal unfair competition; common law unfair competition; and state law trademark dilution. In connection with the federal claims, Registrant asserted its ownership of the Registration. Applicant asserted five counterclaims. The first counterclaim sought a declaratory judgment that Applicant's use of MOAB did not infringe, dilute, or otherwise violate Registrant's rights.[6] The second counterclaim sought cancellation of the Registration on the ground that Registrant used its mark to misrepresent the source of goods. The third, fourth, and fifth counterclaims related to Applicant's rights in marks other than MOAB.

Registrant's state law dilution claim was dismissed with prejudice by summary judgment. The parties' other claims were tried to the Court over a period of several days, and the Court issued a detailed written decision.

With respect to likelihood of confusion, the Court applied the Ninth Circuit's multi-factor test set forth in *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 204 USPQ 808, 814 (9th Cir. 1979). The Court found that Registrant failed to prove by a preponderance of evidence that Applicant's use of the mark MOAB in connection with its JEEP WRANGLER MOAB Special Edition vehicles "was likely to cause confusion

---

[6] Although the application was filed on the basis of intent to use, and remains in intent-to-use status, there is evidence of record showing that Applicant's mark has been used. *See, e.g.*, Office Action of April 2, 2013 at 40-45.

3

on the part of reasonably prudent customers for [Registrant's] upfitted vehicles."[7] The Court therefore dismissed Registrant's federal infringement claim (under 15 U.S.C. § 1114) and common law unfair competition claim.[8] The Court dismissed Registrant's federal unfair competition claim (under 15 U.S.C. § 1125(a)) because "[Applicant] has not created the false or misleading impression that [Applicant's] JEEP WRANGLER MOAB Special Edition vehicles are those of [Registrant]." In summarizing its own detailed analysis of the factors affecting likelihood of confusion, the Court stated:

> Although factor 2 (proximity of the goods) and factor 3 (similarity of the marks) suggest some likelihood of confusion, the other six *Sleekcraft* factors suggest little likelihood of confusion. In particular, the court finds that factor 4 (evidence of actual confusion), factor 5 (marketing channels used), and factor 6 (degree of care likely to be exercised by the purchaser) weigh strongly in favor of a finding that confusion between [Registrant's] upfitted MOAB vehicle and [Applicant's] MOAB Special Edition vehicle is unlikely.[9]

Turning to Applicant's counterclaims, the Court denied as moot Applicant's claim for a declaratory judgment.[10] The Court dismissed Applicant's claim for cancellation of the Registration "because [Applicant's] proof fails to establish by a preponderance of the evidence that [Registrant] deliberately sought to pass off its MOAB vehicles as [Applicant's] goods and [Applicant] has no evidence of any

---

[7] Decision ¶ 69.

[8] *Id.* ¶¶ 69, 71.

[9] *Id.* ¶45.

[10] *Id.* ¶ 73; *see also* Decision part D ("The court declines to take up this counterclaim because the relief which is sought is adequately addressed by the court's findings and conclusions with respect to plaintiff's claims and defendant's other counterclaims.").

economic harm as a result of [Registrant's] resale of JEEP WRANGLER vehicles."[11] The Court also dismissed Applicant's third, fourth, and fifth counterclaims on the merits.[12]

The District Court was fully aware of the pendency of the application that is now before us, and was aware that the USPTO had suspended action. "The USPTO declined to register [Applicant's] MOAB mark, pointing to possible confusion because of [Registrant's] MOAB INDUSTRIES mark. That decision by the USPTO remains subject to further review. The USPTO finding of potential confusion is entitled to very little weight inasmuch as the USPTO would not have had access to most of the evidence which is before the court."[13]

Applicant argues that "The Board … should defer to the more fulsome record upon which the District Court relied to draw its conclusions, and the District Court's careful consideration of likelihood-of-confusion factors …"[14] Referring to the Federal Circuit's leading case, *In re E.I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973), Applicant argues:

---

[11] *Id.* ¶ 74.

[12] *Id.* ¶ 75, 76. Although the Court's decision sometimes refers to Registrant's goods rather than Registrant's services, the Court relied upon the Registration as the source of Registrant's valid and protectable trademark rights, and was careful to note that "[Registrant's] rights based upon the MOAB INDUSTRIES registration are limited to automobile conversion services." However, the Court appears to have given weight to the fact that the end product of Registrant's automotive conversion services was a vehicle highly similar to Applicant's JEEP vehicles. Indeed, Registrant specialized in the conversion of JEEP brand vehicles, a factor that appears to have intensified, in the Court's view, the relatedness of the parties' goods and services.

[13] *Id.* ¶ 43.

[14] Applicant's brief at 2, 12 TTABVUE 7.

Serial No. 85650654

> Under *Du Pont*, the question of likelihood of confusion
> turns "not [on] the *nature* of the mark, but [on] its *effect*
> when applied to the goods of the applicant." *Du Pont*, 177
> U.S.P.Q. at 567. "The words 'when applied' do not refer to
> a mental exercise, but to *all of the known circumstances*
> surrounding use of the mark" in the marketplace. *Id.*, 177
> U.S.P.Q. at 567 (emphasis added). On a comprehensive
> litigation record, the District Court plainly assessed all of
> those "known circumstances" to find that confusion was
> unlikely.[15]

Applicant contends that "there is nothing on this record to indicate that the issues now before the Board are so fundamentally different from those that the District Court has already adjudicated to warrant ignoring the District Court Opinion in the manner that the Examining Attorney advocates. The fact that the District Court evaluated *more* evidence concerning a likelihood of confusion than is typical in *ex parte* appeals does not mean that the Examining Attorney may substitute her judgment, on a lesser record, for the District Court's assessment of the exact same legal standard."[16]

Although there is some overlap between Applicant's defense and counterclaims in the federal court action and the basis of refusal of Applicant's application, they also raise discrete issues. In other words, the issues are not identical. In *MIL v. Chrysler*, Applicant, in the position of defendant, sought – and obtained – a finding that specific alleged marketplace activities did not infringe Registrant's rights in the mark MOAB INDUSTRIES. It also sought – but did not obtain – cancellation of the Registration and a more general declaration of noninfringement.

---

[15] *Id.* at 6, 12 TTABVUE 11.

[16] Applicant's reply brief at 6, 15 TTABVUE 8.

6

In the registration context, likelihood of confusion is determined by the marks, the goods and services, and the usages disclosed in the application and the cited registration. Evidence of actual marketplace usages that seeks to limit or alter the usages encompassed by the marks, goods and services, or usages listed in the application and registration are not considered in assessing likelihood-of-confusion in the registration context. *See B & B Hardware, Inc. v. Hargis Indus., Inc.*, 135 S. Ct. 1293, 113 USPQ2d 2045, 2054 (2015); *see also, e.g., Stone Lion Capital Partners, LP v. Lion Capital LLP*, 746 F.3d 1317, 110 USPQ2d 1157, 1162 (Fed. Cir. 2014); *In re Dixie Rests.*, 105 F.3d 1405, 41 USPQ2d 1531, 1534 (Fed. Cir. 1997).[17] This rule necessarily follows from Section 7(b), which provides that a federal trademark registration on the Principal Register "shall be prima facie evidence … of the owner's exclusive right to use the registered mark in commerce *on or in connection with the goods or services specified in the certificate …*" 15 U.S.C. § 1057(b) (emphasis added). Applicants have the option of tailoring their applications so that the registrations that ultimately issue will more closely reflect market realities: they may identify their goods with greater specificity, indicate a specific use for which the goods are specialized, identify the types of purchasers who use the goods, indicate a price range, specify any trade channels to which their marketing activities may be restricted, and

---

[17] For example, an applicant might seek – and obtain – a registration for "shoes," even though in fact it uses its mark only on women's shoes; or a registration for "hats," even though it uses its mark only on baseball caps marketed exclusively in stadiums. There are some controls for this lack of perfect specificity. A registration's evidentiary significance may sometimes be rebutted; and there are procedures for cancelling or reducing the scope of registrations. *See, e.g.*, 15 U.S.C. §§ 1063 (opposition proceeding), 1064 (cancellation), 1068 (cancellation in part), 1115 (registration rebuttable), 1119 (cancellation by court).

7

describe any specific circumstances that will necessarily attend the sale of the goods.[18] However, where an application contains no such restrictions, examining attorneys and the Board must read the application to cover all goods of the type identified, to be marketed through all normal trade channels, and to be offered to all normal customers therefor. To do otherwise "would be improper because the [goods] recited in the application determine the scope of the post-grant benefit of registration. … It would make little sense for the Board to consider only the parties' current activities when the intent-to-use application, not current use, determines the scope of this post-grant benefit." *Stone Lion*, 110 USPQ2d at 1162-63 (citing *Octocom Sys. Inc. v. Houston Computers Servs. Inc.*, 918 F.2d 937, 16 USPQ2d 1783, 1788 (Fed. Cir. 1990)). Parties that choose to use identifications of goods in their trademark applications that are broader than their actual goods will be held to the broader scope of the application. *See Stone Lion*, 110 USPQ2d at 1162.

When we compare the terms of the registration that Applicant now seeks with the issues that were raised in *MIL v. Chrysler*, we see that they differ substantially. The mark that Applicant seeks to register is MOAB. The District Court, in its conclusions of law, refers to a different mark:

> 69.     … [Applicant] has not infringed on [Registrant's] registered trademark (MOAB INDUSTRIES) by selling [Applicant's] JEEP WRANGLER MOAB Special Edition. …

---

[18] In innumerable cases, the Board hears arguments about how the parties' *actual* goods, services, customers, trade channels, and conditions of sale are narrower or different from the goods and services identified in the applications and registrations. But as stated in equally innumerable decisions of our primary reviewing court, we may consider any such restrictions only if they are included in the identification of goods or services.

70. Plaintiff's Count 2 for federal unfair competition fails for lack of proof of confusion: that is, [Applicant] has not created the false or misleading impression that [Applicant's] JEEP WRANGLER MOAB Special Edition vehicles are those of plaintiff. …[19]

Since Applicant now seeks to register MOAB alone, the rights of registration that Applicant seeks would not be limited to use of the mark MOAB together with the terms JEEP and WRANGLER.

With respect to the goods at issue in *MIL v. Chrysler*, the Court said the following:

34. [Registrant's] MOAB vehicle and [Applicant's] MOAB Special Edition are both JEEP WRANGLER vehicles that have been upfitted in somewhat different ways to enhance their off-road capabilities. …

41. Both plaintiff's and defendant's MOAB vehicles are expensive. While they are both highway legal, the vehicles are intended for off-highway use under difficult to extreme circumstances. …

In *MIL v. Chrysler*, the Court was not considering automobiles in general. Rather, the Court was limiting its consideration to "expensive" "highway-legal, off-road enhanced performance vehicle[s]" that are "upfitted … to enhance their off-road capabilities" and are "intended for off-highway use under difficult to extreme circumstances." The registration that Applicant now seeks relates to a broader range of goods that includes all "passenger automobiles." Applicant also seeks registration for all kinds of "structural parts, trim and badges" of passenger automobiles. These kinds of goods were not addressed in *MIL v. Chrysler*.

As we will discuss *infra*, there are many other ways in which the issues presented to the District Court in *MIL v. Chrysler* differ from the issues framed by

---

[19] Decision ¶¶ 69-70.

this appeal from the Examining Attorney's refusal to register just MOAB for more broadly identified goods. The issues decided by the District Court are not the issues we must decide here.

Applicant argues, quoting *B&B Hardware,* 113 USPQ2d at 2053, that "'[w]hen a district court, as part of its judgment, decides an issue that overlaps with part of the TTAB's analysis, the TTAB gives preclusive effect to the court's judgment.'"[20] *B&B Hardware* dealt with the specific legal principle of "issue preclusion," also known as "collateral estoppel." The Supreme Court clearly was contemplating that the Board would give preclusive effect to a court's judgment in a subsequent Board decision involving the same parties and issues that had been before the court. As the Court stated, "[t]he Restatement explains that subject to certain well-known exceptions, the general rule is that '[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action *between the parties*, whether on the same or a different claim.'" *B&B Hardware*, 113 USPQ2d at 2051 (quoting RESTATEMENT (SECOND) OF JUDGMENTS § 27, p. 250 (1980)) (emphasis added). In other words, the Court in *B&B Hardware* addresses issue preclusion purely in an adversarial context and specifically conditions its holding on "the ordinary elements of issue preclusion" being met. 113 USPQ2d at 2048. One such element is that the party to be charged with issue preclusion have had a full and fair opportunity to litigate its claims in the prior action. *See Parklane Hosiery Co. v.*

---

[20] Reply brief at 1, 15 TTABVUE 3.

*Shore*, 439 U.S. 322, 327 n.7 (1979) (citing *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 329 (1971)).

Applicant seeks to charge the USPTO with issue preclusion in the present proceeding, but the agency was not a party to the prior action. The fact that the USPTO has cited the Registrant's registration in refusing to register the applied-for mark, leading to this appeal, does not indicate that Registrant somehow represented the USPTO in the prior proceeding. The Federal Circuit has long held that a determination in district court litigation does not bind the USPTO in a later *ex parte* proceeding. *In re Trans Texas Holdings Corp.* 498 F.3d 1290, 83 USPQ2d 1835 (Fed. Cir. 2007):

> … [T]he PTO was not even a party to the earlier district court litigation and cannot be bound by its outcome. …
>
> We have never applied issue preclusion *against* a non-party to the first action. In fact, the Supreme Court has specifically held that "litigants ... who never appeared in a prior action[ ] may not be collaterally estopped without litigating the issue.... Due process prohibits estopping them despite one or more existing adjudications of the identical issue which stand squarely against their position." *Blonder–Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 329 (1971) …

83 USPQ2d at 1840. Nothing in the Supreme Court's *B&B Hardware* decision casts doubt on the Federal Circuit's holding.

We have carefully reviewed and considered the District Court's judgment in *MIL v. Chrysler. See Power Integrations, Inc. v. Lee*, 797 F.3d 1318, 116 USPQ2d 1137, 1142 (Fed. Cir. 2015). As we have noted above, however, the questions raised in *MIL v. Chrysler* and in this appeal from a refusal of registration are different, at

least in part, and require, to some extent, different analyses that could result in different determinations. As the Supreme Court said of the trademark registration process as compared to infringement litigation, "it is a separate proceeding to decide separate rights." *B&B Hardware*, 113 USPQ2d at 2053.[21]

Bearing all of this in mind, we now turn to the refusal of registration under Section 2(d).

2. <u>Refusal under Section 2(d)</u>.

Our determination under Section 2(d) is based on an analysis of all of the probative facts in evidence that are relevant to the issue of likelihood of confusion. *In re E.I. du Pont de Nemours & Co.*, 177 USPQ at 567. Although the "*du Pont* factors" may not explicitly include all of the "*Sleekcraft* factors" considered by the District Court in *MIL v. Chrysler*, we may consider the *Sleekcraft* factors nonetheless because a proper *du Pont* analysis must consider "[a]ny other established fact probative of the effect of use" (*i.e.*, the "thirteenth" *du Pont* factor). We have considered all *Sleekcraft* and *du Pont* factors for which there is evidence of record.

---

[21] In her concurring opinion, Justice Ginsburg underscored that issue preclusion would not apply "for a great many registration decisions." *B&B Hardware*, 113 USPQ2d at 2056.

(a) <u>The goods and services</u>.

We will first consider the similarity or dissimilarity of the goods and services as identified in the application and the cited registration. *Stone Lion*, 110 USPQ2d at 1161-62; *Octocom*, 16 USPQ2d at 1787. They are:

> Motor vehicles, namely, passenger automobiles, their structural parts, trim and badges.
>
> Automotive conversion services, namely, installing specialty automotive equipment.

We must presume that Applicant's goods include all goods of the type identified, *i.e.*, all "passenger automobiles [and] their structural parts," as well as all kinds of automotive "trim and badges." For the same reason, we consider Registrant's services to include installation of all kinds of specialty automotive equipment, and not merely equipment to enhance off-road capability.

Likelihood of confusion may arise with respect to goods and services if they "are related in some manner and/or if the circumstances surrounding their marketing are such that they could give rise to the mistaken belief that they emanate from the same source." *Coach Servs. Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1722 (Fed. Cir. 2012). Registrant's service involves installing equipment on automobiles. The "specialty automotive equipment" mentioned in Registrant's identification is broad enough to encompass "structural parts" of the types identified in Applicant's identification. Moreover, the evidence reveals that several automotive conversion businesses not only provide conversion services but also sell parts and kits to allow customers to upfit their own vehicles:

> [I]f you'd like to convert your gas-powered rig to diesel power, there are actually a surprising number of companies that specialize in these conversions. Some offer problem solving parts and kits, others offer complete in-house conversions, and a few offer the whole enchilada with parts, kits, and the option of a complete in-house conversion.[22]

The article specifically identifies the following businesses that perform conversions and sell structural parts:

| | |
|---|---|
| Bruiser Conversions: | "If you wish to complete the conversion, the company offers components to install a 4BT into your CJ, YJ, or TJ."[23] |
| HPA Motorsports | "… you can either purchase one of HPA Motorsports do-it-yourself kits or you can let the company complete the conversion in-house. … Stage 2 [kit] … [adds] the engineered air-to-water intercooling system, a performance ECU tune that has reconfigured the injection around the ultra-efficient boost track, a bracket for the gas pedal filment [*sic*], and key coolant line fittings to better facilitate the Volkswagen cooling system.[24] |
| Diesel Toys | "Kits include … four-speed automatic or five-speed manual transmission; and a Diesel Toys installer kit that includes installation DVD, badges, CNC-machined motor mounts, fuel system bracket/line kit, fan shroud, and proprietary plug-n-play wiring harness."[25] |
| Diesel Conversion Specialists | "… you can either send the truck to Diesel Conversion Specialists and have them fit it for you or you can purchase the conversion parts and do it yourself. The company offers engine mounting kits |

---

[22] "14 companies that specialize in diesel conversions," <fourwheeler.com>, Office Action of February 21, 2017 at 46.

[23] *Id.*

[24] *Id.* at 47.

[25] *Id.* at 50.

|  | to fit a 12- or 14-valve Cummins turbodiesel engine … Diesel Conversion Specialists also offers … a wide range of parts and accessories including a number of transmission adapter plates."[26] |
|---|---|
| H-Line Conversions | "H-Line can provide you with a do-it-yourself kit or the company can do the swap for you."[27] |

*See also* the following reference to an automotive conversion business that manufactures its own structural parts (emphasis added):

> Moab Motorsports is a full service offroad *fabrication* and repair shop. We offer custom fabrication including tube bending … and ring and pinion/locker *installations* just to name a few of our capabilities. … We also stock custom tube *chassis* which are manufactured completely *in house*.[28]

Registrant's web site includes a customer testimonial recounting Registrant's offer to "mail the stabilizers directly to the dealership"[29] for installation, indicating that Registrant is perceived as a source of structural parts.

The record also shows that customers would expect an authorized automobile dealer, like Applicant's dealers, to also sell and install specialty automotive equipment. Applicant's advertising of optional equipment for its vehicles states "Jeep Accessories by Mopar offer the opportunity to enhance and personalize your Jeep Wrangler. They are *available for purchase and installation* at your Jeep dealer."[30] *See also* Applicant's listing of "Standard and Optional Features" for its new

---

[26] *Id*. at 52.

[27] *Id*. at 53-54.

[28] Response of December 23, 2016 at 64.

[29] *Id*. at 228.

[30] *Id*. at 47 (emphasis added).

15

automobiles.[31] While structural parts installed by a dealer would likely be "original equipment manufacturer" ("OEM") parts, the record shows that independent automotive service providers are also able to install OEM parts:

> You can request OEM parts from your local mechanic, but it may take longer to get your vehicle repaired since the parts must be ordered.[32]
>
> *****
>
> Following is a list of companies that can help you complete a diesel conversion. … Some of the engine swaps are mainstream, while others use the less prevalent Toyota, Mercedes-Benz, and Volkswagen diesel engines.[33]
>
> …
>
> Diesel Toys also offers diesel conversions for the Jeep TJ (using a Toyota turbodiesel) and the Jeep JK (using a VM Motori turbodiesel).[34]
>
> …
>
> Eco-Offroad can do an in-house diesel conversion on your Toyota FJ-45 pickup, FJ-40 Land Cruiser, Land Rover Series II, IIA, or III, or Land Rover Defender. Depending on your vehicle and needs, the company fits the Cummins 3.3L or 3.9L 4BT, 2.8L IH, Mercedes OM617, or Isuzu turbodiesel engines.[35]

This evidence shows that customers may expect automotive structural parts (like those Applicant offers) and automotive conversion services (like those Registrant

---

[31] *Id.* at 56; *see also id.* at 51 ("Standard Features … Available Options").

[32] "Aftermarket Versus Manufacturer Car Parts," <edmunds.com>, Office Action of April 2, 2013 at 15-18.

[33] "14 Companies that Specialize in Diesel Conversions," <fourwheeler.com>, Office Action of February 21, 2017 at 45, 46.

[34] *Id.* at 50.

[35] *Id.* at 54.

provides) to emanate from the same source. It also shows that customers would expect that sellers of new automobiles, like Applicant, would also provide installation of specialty automotive equipment, as Registrant does. Moreover, it shows that OEM structural parts, like those falling within Applicant's identification of goods, may be obtained through an independent installer, like Registrant. The relationship between the goods and services favors a finding of likelihood of confusion.

(b)     Trade channels.

We next consider the established and likely to continue trade channels. As there are no limitations as to channels of trade in the identifications of goods and services in the registration and application, we presume that the goods and services move in all channels of trade that are normal for such goods and services. *See Octocom,* 16 USPQ2d at 1787; *Paula Payne Prods. Co. v. Johnson Publ'g Co.*, 473 F.2d 901, 177 USPQ 76 (CCPA 1973); *In re Linkvest S.A.,* 24 USPQ2d 1716, 1716 (TTAB 1992).

Obviously, businesses that install automotive equipment are channels of trade through which structural parts of automobiles travel. Indeed, the record reveals that conversion shops sometimes install OEM equipment originating from automobile manufacturing companies like Toyota, Mercedes-Benz, Volkswagen and Isuzu. Registrant's website offers to install "the best suspension parts from different companies"[36] and includes testimonials that refer to repair of a "track bar bracket,"

---

[36] Applicant's response of December 23, 2016 at 230.

17

stabilizers, gears, pitman arm, wheels, tires, "Spider gears," and "Long Arms."[37] Moab Motorsports' website offers "custom tube chassis."[38] Applicant's advertisements indicate that structural parts include "heavy duty rear axle," "rock rails ... to help protect your rocker panels and lower bodysides," "Kevlar tires," "taillamp guards," "custom bumpers,"[39] and shock absorbers, brakes, wheels, and many other parts.[40]

In *MIL v. Chrysler*, the District Court found as follows with respect to marketing channels:

> 40. The parties' uncontested facts … reflect that the parties' marketing channels are very different. [Applicant] sells "off the assembly line" new vehicles through its authorized dealers. [Registrant] purchases new vehicles from [Applicant's] dealers, upfits them, and resells them through auction and licensed resale dealers, in some instances the used car lots of defendant's authorized dealers. This factor suggests little likelihood of confusion.[41]

The Court addressed the trade channels for Applicant's finished automobiles and Registrant's upfitted automobiles. This case is different, however, as we must also consider the "structural parts" identified in Applicant's application. Although there may be little or no overlap between the trade channels for finished automobiles and automotive conversion services, we find that Registrant's service is, itself, a trade

---

[37] *Id*. at 227-28.

[38] *Id*. at 64. An automotive "chassis" is the frame upon which the automobile's body is mounted. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 379 (1993).

[39] Applicant's response of December 23, 2016 at 217-18.

[40] *Id*. at 56.

[41] Decision ¶ 40, Applicant's response of December 23, 2016 at 279-80.

channel for automotive structural parts like those of Applicant, and this circumstance also weighs in favor of a finding of likelihood of confusion.

(c)  Customers; conditions of sale.

Under *du Pont*, we consider the customers to whom and the conditions under which sales are made. Applicant faults the Examining Attorney for ignoring this element of the *du Pont* analysis, arguing:

> "An automobile is a major purchase, and one in which a reasonably prudent purchaser would invest a great deal of care and attention, rendering confusion less likely." [Citation omitted.] Furthermore, "it is clear that automobiles are expensive and would only be purchased after careful consideration, thereby reducing the risk of confusion." [Citation omitted.]
>
> Moreover, [Registrant's] own description of services makes clear that its services are also quite specialized and likely to be purchased after careful consideration by consumers. …
>
> The District Court recognized that the parties' respective offerings are not impulse purchases. Instead, the Court held that consumers are likely to engage in careful consideration and investigation prior to making a purchase, because they seek to use both Applicant's vehicles and vehicles converted by [Registrant] for difficult and extreme circumstances.[42]

Applicant's argument does not take into account that its identified goods are not limited to automobiles, but also include "structural parts, trim and badges"; nor is the identification of "automobiles" limited to expensive automobiles for use under "difficult or extreme" conditions. Applicant seeks registration of its mark for all "passenger automobiles," which we must interpret to include the smallest and least

---

[42] Applicant's brief at 8-9, 12 TTABVUE 13-14.

expensive subcompacts as well as expensive vehicles for specialized uses. Of course, any automobile is likely to be considered a substantial purchase for most customers and such a purchase would not be made on impulse. However, with respect to customer sophistication, we must consider a broader class of purchasers than the District Court did, because Applicant has not tailored its application to conform to the issues addressed by the District Court. In addition, Board precedent requires our decision to be based on the least sophisticated potential purchasers. *Stone Lion*, 110 USPQ2d at 1163. Offroad enthusiasts may be sophisticated customers; but many customers for "passenger automobiles" are merely interested in obtaining a reliable mode of transportation and have little understanding of how the car works or the limits of its performance. They would exercise an elevated degree of care in selecting an automobile, but they would not have the sophistication of an automotive enthusiast. They would bring less care to the selection of a part or trim for their cars, as these would be less costly purchases.

We agree that customers for "automotive conversion services" would be likely to have the sophistication of an automotive enthusiast. The only evidence of record that illustrates what "conversion" means indicates that it involves substantial rebuilding of a vehicle, either substituting a diesel engine for a gasoline engine, or upfitting the vehicle for off-road use as in the case of Registrant's actual services.

Applicant also relies on its expert, Dr. Ravi Dhar, as to the care and sophistication of customers and the relevant purchasing context. Dr. Dhar explained:

> 49. … Broadly speaking, the manner in which consumers
> process information in the marketplace, including arriving

at any inference of source, will vary across the product categories (e.g., toothbrush versus automobiles). Specifically, two broad sets of factors that relate to the motivational and cognitive systems determine the degree of care exercised in processing available information by potential consumers. The cognitive system refers to the ability of consumers to process the amount and type of information that may be available at the point of purchase and motivational system refers to the willingness of consumers to process the types of information that are available. While the motivation and ability to process information vary across product categories and purchase contexts, it is my opinion that they are both likely to be very high in the purchasing context of Jeep brand vehicles for the reasons that are discussed next.

50. The motivation to process available information depends on the degree of personal involvement that a consumer has with the product. Generally speaking, consumer involvement in a purchase decision depends not only on the price of a product (i.e., higher priced products usually result in higher involvement or exercising greater care) but also on the perceived personal relevance of the product (i.e., products that are seen as being more relevant to oneself result in higher involvement). An automobile purchase is very expensive compared to most purchases, and other factors also suggest that the product relevance is likely to be very high, as many consumers associate the purchase of SUV/trucks with personal interest. In summary, the higher involvement in the purchase decision will lead to consumers exercising a very high degree of care in gathering information on the purchase including that of source of the goods purchased. Further, there is almost always a sales person readily available in the automotive vehicle purchase context to address any questions with regards to source or affiliation prior to purchase. This means that consumers who exercise even a modest level of care during the purchase process can easily obtain information about the source of the product, rather than relying on the word "Moab" on the Jeep brand vehicles.[43]

---

[43] Report of Dr. Ravi Dhar ¶¶ 49-50, Applicant's response of December 23, 2016 at 314-15.

Dr. Dhar prepared his report in connection with the District Court case and as a result it was limited in a number of ways that reduce its relevance here. First, it addressed the likelihood of confusion caused by the "MOAB mark used in connection with [Applicant's] Jeep brand."[44] Second, his conclusions regarding customers were based on a substantially more limited universe than the one we must consider in connection with the involved application. Dr. Dhar looked only at customers meeting the following requirements (among others):

> c. They must be considering purchasing/leasing a Crossover or Compact SUV (Sport Utility Vehicle) or Large SUV (Sport Utility Vehicle) or Pick-Up Truck within the next 3 years for personal use.
>
> d. They must require that the Crossover or Compact SUV (Sport Utility Vehicle) or Large SUV (Sport Utility Vehicle) or Pick-Up Truck that he/she is considering purchasing/leasing within the next 3 years for personal use be capable of off-road driving.[45]

The application's identification of goods is not limited to larger vehicles capable of off-road driving. Accordingly, the purchasers that we must consider are different and have different characteristics than automotive enthusiasts. We have no evidence that a compact car buyer has the same type or degree of "personal involvement" with a car utilized for commuting or similar purposes, as compared to that an off-roading enthusiast would have; nor would the price of such a purchase be as great as the price of a "Crossover" or SUV capable of off-road driving. Accordingly, Dr. Dhar's remarks regarding customer care and sophistication skew too far in the direction of great care

---

[44] Dhar Report ¶ 14, *id.* at 302.

[45] Dhar Report ¶ 25, *id.* at 305-6.

and great sophistication. Moreover, he did not consider the care and sophistication that would come into play in connection with the purchase of structural parts, trim or badges, rather than a complete car.

Overall, the facts relevant to this *du Pont* factor are mixed. Registrant's customers would be careful and sophisticated automotive enthusiasts. Applicant's customers would include ordinary drivers with no particular automotive sophistication or enthusiasm. They would likely exercise care in purchasing Applicant's cars, with high attention to the source of the goods, but less care (although still elevated care) in purchasing replacement parts or trim.

(d)     The marks.

Next we consider the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression. *See Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689 (Fed. Cir. 2005). "The proper test is not a side-by-side comparison of the marks, but instead 'whether the marks are sufficiently similar in terms of their commercial impression' such that persons who encounter the marks would be likely to assume a connection between the parties." *Coach Servs. Inc. v. Triumph Learning LLC*, 101 USPQ2d at 1721.

Applicant's mark is MOAB and the mark in the cited registration is MOAB INDUSTRIES. The marks are similar in appearance, sound and meaning inasmuch as each includes the term MOAB. The additional term INDUSTRIES in Registrant's mark is a point of difference in appearance, sound, and meaning. However,

23

INDUSTRIES is merely descriptive with respect to a wide range of commercial enterprises, including the manufacture of automobiles and the installation of automotive equipment.[46] Customers are not likely to view the term INDUSTRIES as an indicator of source. Rather, they would look primarily to MOAB, in both marks, as the source indicator. Although we have considered each mark in its entirety, there is nothing improper in our finding that MOAB is dominant because our ultimate conclusion rests upon a comparison of the marks in their entireties. *In re Nat'l Data Corp.*, 753 F.2d 1056, 224 USPQ 749, 751 (Fed. Cir. 1985).

Overall, we find that the marks create similar commercial impressions. This *du Pont* factor weighs in favor of a finding of likelihood of confusion.

(e)     Strength of the term MOAB; similar marks in use.

We consider Registrant's mark's inherent strength based on the nature of the term itself and its commercial strength based on use in the marketplace. *See In re Chippendales USA, Inc.*, 622 F.3d 1346, 96 USPQ2d 1681, 1686 (Fed. Cir. 2010). The Federal Circuit has held that evidence of the extensive registration and use of a term by others can be powerful evidence of the term's weakness. *Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. v. Millennium Sports, S.L.U.*, 797 F.3d 1363, 116 USPQ2d 1129, 1136 (Fed. Cir. 2015); *Juice Generation, Inc. v. GS Enters. LLC*, 794 F.3d 1334, 115 USPQ2d 1671, 1674 (Fed. Cir. 2015). Evidence of third-party use may reflect commercial weakness, while third-party registration evidence, which does not prove

---

[46] *See* definition of "industry" as "Commercial production and sale of goods," "A specific branch of manufacture and trade," and "any general business activity." Definitions from <thefreedictionary.com>, Office Action of April 2, 2013 at 10-11.

third-party use, may bear on conceptual weakness if a term is commonly registered for similar goods or services. *See Tektronix, Inc. v. Daktronics, Inc.*, 534 F.2d 915, 917 (CCPA 1976).

Applicant argues that MOAB is conceptually and commercially weak. The record shows that MOAB is the name of a geographic location in Utah, known for its backcountry trails which are a popular destination for 4-wheel drive enthusiasts.[47] To the extent that Applicant's automobiles include vehicles capable of off-road driving and Registrant's services involve upfitting vehicles for off-road use, MOAB is suggestive of the purpose of the goods and services, rendering the term somewhat weak conceptually.[48] Applicant has also made of record two third-party registrations, as follows:[49]

| Reg. No. 4072245 | MOAB TAXI | "Taxi transport." |
| Reg. No. 1866329 | MOAB | "Bicycles." |

Another third-party registration, No. 4078497 for the mark MOAB STAR (and design) for headlights, other lights for vehicles, brake pads, skid plates, and other automotive accessories, was cancelled in 2013.[50] These registrations do little to prove

---

[47] Applicant's response of March 4, 2013 at 34-46; Applicant's response of December 23, 2016 at 68-79.

[48] The District Court too observed: "The Court finds that the Moab mark, which both [Registrant and Applicant] affix to JEEP WRANGLER vehicles, is relatively weak, lying for purposes of this case somewhere between suggestive and arbitrary." Decision ¶ 33.

[49] Response of March 4, 2013 at 28-33.

[50] Applicant's response of December 23, 2016 at 23.

the conceptual weakness of MOAB, because only one relates to the field of automotive goods or services.

To demonstrate the commercial weakness of the term MOAB, Applicant has submitted short excerpts of web sites advertising the following businesses:

| | |
|---|---|
| M40 MOAB 4X4 OUTPOST | referring to "customer vehicles we've had the privilege of working on."[51] |
| MOAB MOTORSPORTS | "a full service offroad fabrication and repair shop located in Moab, UT."[52] |
| MOAB OFFROAD in Lexington, KY. | referring to "Specializing in 4x4 for over 10 years!"; "Moab's Retro YJ Built"; and "You Told Us the Ultimate Jeep and Now We Are Building It."[53] |

Applicant also points to ¶¶ 21-22 of the District Court decision as evidence that automotive conversion businesses exist under the names "Moab Offroad" in Lexington, KY and "Moab 4x4 Outpost" in Moab, Utah, and that other MOAB marks exist in the fields of stores featuring clothing, camping gear, and sporting goods; juices and fruit drinks; cutlery; eyewear for sports; computer tools; and anger management training. However, with the exception of the two automotive conversion marks, we would consider these third-party uses to be of minimal probative weight in demonstrating the weakness of MOAB in the automotive field. Applicant points out that in the District Court case Registrant produced no evidence of the commercial

---

[51] *Id.* at 60-61.

[52] *Id.* at 62-66.

[53] *Id.* at 59.

strength of its mark.[54] On the other hand, here Applicant has introduced only a few examples of third-party use, other than those discussed in *MIL v. Chrysler*.

There is a degree of inherent weakness in the term MOAB, but the weakness relates only to a subset of the goods and services at issue: *i.e.*, automobiles for off-road driving and conversion services for upfitting cars to make them suitable for off-road use. We doubt that the suggestiveness of MOAB would be appreciated in the context of other types of cars (*e.g.*, small hybrids or light-weight electric automobiles) or other types of vehicle conversion. Therefore, we find that, while the inherent weakness of MOAB diminishes the likelihood of confusion, the degree to which it is diminished is minor.

(f)     Absence of actual confusion.

Applicant argues in its brief that a lack of substantial evidence of actual confusion weighs against a finding of likelihood of confusion.[55] Generally, in an *ex parte* proceeding a lack of evidence of actual confusion carries little weight, because the cited registrant is not a party to the proceeding and the typical contentions of the applicant's witnesses, to the effect that they are not aware of any instances of actual confusion, tell only one side of the story and are often uncorroborated. *See In re Majestic Distilling Co.*, 315 F.3d.1311, 65 USDPQ2d 1201, 1205 ("we agree with the Board that Majestic's uncorroborated statements of no known instances of actual

---

[54] *See also* Decision ¶ 33 ("Plaintiff has produced no evidence of the commercial strength of the MOAB mark as used by plaintiff. Defendant has produced no evidence of the commercial strength of the MOAB mark as used by defendant, and defendant no longer uses the MOAB mark on its vehicles.").

[55] Applicant's brief at 7-8, 12 TTABVUE 12-13.

confusion are of little evidentiary value. [Citation omitted.] A showing of actual confusion would of course be highly probative, if not conclusive, of a high likelihood of confusion. The opposite is not true, however. The lack of evidence of actual confusion carries little weight, [citation omitted], especially in an *ex parte* context.").

In the present case, we have an unusual situation: in *MIL v. Chrysler*, Applicant and Registrant squarely confronted each other and Registrant offered "live and deposition testimony" of seven witnesses who professed to have suffered confusion. Applicant's expert Dr. Dhar also testified, providing his analysis of the testimony of four of the confusion witnesses. The Court, in its Decision, discussed the testimony of the confusion witnesses, finding that it constituted "no substantial evidence of confusion on the part of customers for [Registrant's] MOAB vehicles."[56] Applicant has not entered into our record the testimony of the confusion witnesses; accordingly, we have only evidence showing that Registrant was not able to persuade the District Court that confusion had occurred. Registrant's failure has limited relevance to our analysis, because Registrant attempted to demonstrate actual confusion caused by Applicant's use of MOAB on vehicles that were also branded JEEP and WRANGLER. Here we are concerned only with the likelihood of confusion between the marks MOAB and MOAB INDUSTRIES.

Applicant has also made of record Dr. Dhar's expert report, based upon the results of a survey that he conducted.[57] Dr. Dhar found:

---

[56] Decision ¶¶ 36-39, Applicant's response of December 23, 2016 at 277-280.

[57] Although Applicant's brief seems to suggest that Dr. Dhar's survey was before the District Court in *MIL v. Chrysler*, the Court's decision indicates otherwise: "*Dr. Dhar did not perform*

28

> After controlling for noise, my survey shows that the net level of confusion between the MOAB INDUSTRIES word mark and Chrysler Group's MOAB mark used in connection with the Jeep brand is 2.33%. Stated another way, I find that the level of confusion between the MOAB INDUSTRIES word mark and Chrysler Group's MOAB mark used in connection with the Jeep brand is de minimis when tested in realistic marketplace conditions.[58]

After careful consideration, we find that, for numerous reasons, the survey upon which Dr. Dhar based his opinion does not provide reliable guidance for our purpose. As we noted above in our discussion of customer care and sophistication, Dr. Dhar's survey did not consider the entire universe of customers for automobiles, trim and structural parts; rather he limited his survey to customers for vehicles capable of off-road driving, a universe of customers that is much more limited than the one that concerns us in this case. For this reason alone, the Dhar survey is of limited probative value here.

In determining registrability, we must consider the mark that Applicant actually seeks to register. The Dhar survey, however, did not test the public's reaction to that mark, MOAB, but instead to the "MOAB mark used in connection with the Jeep brand." Dr. Dhar described the purpose of the survey as follows:

> Specifically, I was asked to conduct a consumer survey to provide an expert opinion concerning whether or not relevant consumers are confused as to source, affiliation, sponsorship or approval regarding the Jeep brand's use of

---

nor did [Registrant] undertake *any survey evidence addressing the subject of customer confusion.*" Decision ¶ 38.

[58] Dhar Report ¶ 14, Applicant's response of December 23, 2016 at 302.

the MOAB mark on the 2013 Jeep Wrangler Moab Edition vehicle.[59]

Applicant does not now seek to register the mark JEEP MOAB or the mark MOAB as "used in connection with the JEEP brand." The mark at issue is MOAB. Considering Applicant's contention that JEEP is a famous mark,[60] the display of the mark MOAB in association with or in close proximity to the JEEP mark would create a very different commercial impression than MOAB alone. In the Dhar survey, subjects were shown the following stimulus:[61]



---

[59] Dhar Report ¶ 10, *id.* at 300.

[60] *See* ¶ 15 of Applicant's Counterclaim in *MIL v. Chrysler*, Applicant's response of December 23, 2016 at 92.

[61] Dhar Report at E-17, Applicant's response of December 23, 2016 at 358.

Survey subjects would very likely be influenced by the above display to perceive the MOAB product as originating from the same source as JEEP products.

Another aspect of the Dhar survey that raises doubt is that it was designed to test *forward* confusion, rather than reverse confusion. "My survey was designed to assess the likelihood that ordinary purchasers of certain vehicles would, upon encountering the Jeep Wrangler Moab Edition vehicle in the marketplace, believe that the Jeep Wrangler Moab Edition is associated with or sponsored or approved by Moab Industries."[62] The assumption that this was the type of confusion most likely to arise is counterintuitive, considering the fame of the JEEP brand (as well as the WRANGLER brand, another mark that Applicant characterizes as famous), with which the MOAB brand would be associated in the survey. Indeed, in *MIL v. Chrysler*, Registrant asserted a claim of reverse confusion.[63] The District Court's explanation of the distinction is illuminating:

> Forward confusion occurs when consumers believe that goods bearing the junior mark [here defendant] came from, or were sponsored by, the senior mark holder [here plaintiff]. By contrast, reverse confusion occurs when consumers dealing with the senior mark holder [here plaintiff] believe that they are doing business with the junior one [here defendant]. In such a case, the smaller senior user, such as [plaintiff], seeks to protect its business identity from being overwhelmed by a larger junior user who has saturated the market with publicity.[64]

---

[62] Dhar Report ¶ 11, *id*. at 300.

[63] Decision Part B, preamble.

[64] *Id*. (internal quotations omitted; citations omitted).

31

The very modest size of Registrant's operations (Registrant upfitted "53 vehicles in 2011, 70 in 2012, and 92 in 2013")[65] strongly suggests that, in a confrontation between the goods and services of Applicant and Registrant in the marketplace, the more likely type of confusion would be reverse confusion, *i.e.*, a mistaken perception of the commercially weaker brand emanating from the source of the commercially stronger brand.

The *Eveready* format[66] of the Dhar survey also gives rise to doubt. In an *Eveready* survey, respondents are shown one party's mark and are asked open-ended questions about its source. Accordingly, any response indicating confusion with the other party's mark must result from the respondent's unaided recollection of the other mark. In the Dhar survey, respondents were shown the stimulus reproduced above, in which the mark JEEP was prominently displayed in proximity to MOAB, and were asked questions about the source of the pictured vehicle, including:

> If you have an opinion, which company do you think makes or puts out this vehicle?
>
> What other products or services, if any, are offered by the company that makes the vehicle in front of you?
>
> If you have an opinion, does or doesn't the company that makes the vehicle in front of you have a business connection or affiliation with another company? [3 optional answers offered]

---

[65] *Id.* ¶ 16.

[66] *See Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366, 188 USPQ 623, 640-43 (7th Cir. 1976). *See also* 6 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32:174 (5th ed.); *Anheuser-Busch, LLC v. Innvopak Sys. Pty. Ltd.*, 115 USPQ2d 1816, 1828 (TTAB 2015).

> With which other company does the company that makes the vehicle in front of you have a business connection or affiliation?
>
> If you have an opinion, did or didn't the company that makes the vehicle in front of you receive permission or approval from another company to make the vehicle? [3 optional answers offered]
>
> From which other company did the company that makes the vehicle in front of you receive permission or approval?

The stimulus shown to subjects contains many strong suggestions of the source of the MOAB brand: prominent display of the assertedly famous mark JEEP; repeated references to the assertedly famous mark WRANGLER; and references to MOAB as an "Edition" of JEEP and WRANGLER. Considering the modest scope of Registrant's operations, the likelihood that survey respondents would have knowledge of the MOAB INDUSTRIES brand is small. We find that this survey does not fairly test whether relevant customers, exposed to both marks, would experience confusion as to source.

Overall, as the Dhar survey did not test the impact of the mark that Applicant seeks to register; addressed an underinclusive universe of relevant customers; and was ill-suited to test the type of confusion that is most likely to occur, we give little weight to the survey's results. We treat the absence of a showing of actual confusion as a neutral factor.

(g)     <u>Balancing the factors</u>.

The marks are similar. The common term MOAB is not inherently particularly strong, because it is suggestive of the intended off-road driving purpose of some of the goods and services; however, there is very little indication of commercial weakness.

33

The goods (in particular, automotive structural parts) and services are related and are of types that customers would expect to emanate from a single source. Although the goods and services are not likely to be marketed through the same channels of trade, Registrant's service is a channel through which Applicant's goods (in particular structural parts) reach their ultimate customers: that is, Registrant would install structural parts on customers' automobiles and might also be the source through which such structural parts are purchased. Applicant's goods and Registrant's services are likely to be selected with an elevated degree of care, and the involvement of salespersons at the point of sale would reduce the likelihood of confusion.

Balancing all of these factors, we find that Applicant's mark, as intended to be used on the identified goods, so resembles Registrant's registered mark, as used in connection with Registrant's identified services, as to be likely to cause confusion.

Decision: The refusal under Section 2(d) is AFFIRMED.